S03A0367. SCHRENKO et al. v. DEKALB COUNTY SCHOOL
DISTRICT et al.

(582 SE2d 109)

Fletcher, Chief Justice.

The DeKalb County School District filed a mandamus action seeking to compel the State Board of Education to change its policy for allocating transportation funds to local school systems and reimburse DeKalb for its past costs in transporting students enrolled in the majority-to-minority transfer and magnet school programs. The trial court concluded that the State has improperly interpreted OCGA § 20-2-188, the student transportation statute, for nearly 40 years and ordered the State to pay $105 million to DeKalb for transportation costs incurred since 1978.

This appeal involves two issues: (1) whether the phrase "the school to which [students] are assigned" in OCGA § 20-2-188 means the school in the student's attendance zone or the school that the student actually attends and (2) whether mandamus may issue to compel payment of state education funds to local systems for their past costs in transporting students. Because the State has adopted a reasonable interpretation of "school to which they are assigned" as the school in the student's attendance zone, we hold that DeKalb is not entitled to mandamus relief to compel the State Board of Education to provide funding for the district's costs of transporting students to the M-to-M and magnet school programs. We reverse the trial court's contrary rulings.

*Prior Proceedings*

In 1990, the DeKalb County School District, members of the DeKalb County Board of Education, and several individuals sued the State in the federal district court in Atlanta to recover transportation and program costs incurred because of desegregation litigation involving the school district's former dual system of education.[1] On

---

[1] See *DeKalb County Sch. Dist. v. Rogers*, Civil No. 1:90-CV-1769-WCO (N.D. Ga. filed 1990); see also *DeKalb County Sch. Dist. v. Schrenko*, 109 F3d 680, 682 (11th Cir. 1997) (giving history of district's desegregation litigation). See generally *Freeman v. Pitts*, 503 U. S.

the state law claim, the federal district court held that the State's policy for funding transportation violated OCGA § 20-2-188 (d), awarded $25 million in state funds to DeKalb for past transportation expenses, and ordered the State to base its future calculation of transportation funding on each student's actual school of attendance.[2] The United States Court of Appeals for the Eleventh Circuit reversed.[3] It held that the State was immune from liability under the Eleventh Amendment from the federal court's award of retrospective monetary damages and prospective injunctive relief.[4]

Four years later, DeKalb and the county school board members filed this mandamus action in state court against the State Superintendent of Schools, State Director of Transportation, and State Board of Education seeking to overturn the State's policy on state aid for pupil transportation that has been in place since the mid-1960's. DeKalb alleged that OCGA § 20-2-188 requires the State to provide transportation funding for M-to-M and magnet school students and sought payment for costs that it had incurred in providing transportation for those students since 1978. The parties conducted limited discovery and presented legal arguments, but no testimony, in a one-day hearing before the trial court; the voluminous record consists primarily of exhibits, documents, depositions, and trial transcripts from DeKalb's federal lawsuit and a similar suit filed in federal district court in Savannah on school desegregation.[5]

Ruling in DeKalb's favor on all issues, the trial court concluded that (1) OCGA § 20-2-188 requires state officials to calculate and pay transportation funds to local systems based on the school students actually attend; (2) mandamus is the appropriate remedy for the district to recover funds wrongfully withheld by the State since 1978; (3) the State is compelled to pay the district $68,070,433 in principal and $36,480,095 in interest for funds that should have been paid for student transportation between 1978 and 2001; and (4) the State must calculate and pay state transportation funds to DeKalb in the future based on the school that the student attends.

Like the earlier federal lawsuit, this case involves DeKalb's "effort to shift the burden for some of the costs of its desegregation

---

467 (112 SC 1430, 118 LE2d 108) (1992) (district court may relinquish control of school district in incremental stages).

[2] See *DeKalb County Sch. Dist. v. Rogers*, Civil No. 1:90-CV-1769-WCO, slip op. at 20-23 (N.D. Ga. Sept. 23, 1994). Contra *Board of Pub. Educ. for the City of Savannah and the County of Chatham v. State of Georgia*, No. CV 490-101, slip op. at 30-33 (S.D. Ga. Aug. 27, 1993) (concluding that statute does not preclude State Board from construing "school to which they are assigned" to mean the school within the student's attendance zone).

[3] See *DeKalb County Sch. Dist. v. Schrenko*, 109 F3d at 682.

[4] See id. at 690-691.

[5] See *Board of Pub. Educ. v. State of Georgia*, No. CV 490-101.

measures to the State and, by extension, the state's taxpayers at large."[6] Unlike the federal lawsuit and contrary to DeKalb's contentions, this appeal is not about whether the State's policy for funding student transportation is, or ever has been, racially discriminatory.[7] Instead, the mandamus petition raises an issue concerning whether the State has properly construed the state transportation funding statute.

### *The Student Transportation Statute*

OCGA § 20-2-188 is the provision in the Quality Basic Education Act that governs the State's allotment of state aid to local school systems for their costs in transporting students to school. Subsection (a) requires the State Board of Education to calculate the amount of funds that a local system needs to operate an economical and efficient student transportation program. These calculations are based on schedules of standard transportation costs and variable cost factors. In establishing these costs, the state board is given the discretion to consider many factors, including the number and density of students transported and areas served, the suitability of school bus routes, the types and numbers of buses used, the miles that buses travel, minimum bus loads, and transportation surveys.

Subsection (d) describes the "transported students" that the state may count for the purpose of calculating the local school system's expense of transporting students to and from school. The statute requires that all students, except handicapped students, must live more than one-and-a-half miles from their assigned school before they are eligible to be counted.

> (d) Students who live beyond one and one half miles from *the school to which they are assigned,* according to the nearest practical route by school bus, shall be eligible to be counted as transported students for the purpose of calculating that portion of the expense of student transportation associated with transporting students from home to school and from school to home as authorized under subsection (a) of this Code section, provided such students are actually transported to such school by school bus or other vehicle made available for this purpose by the local unit of adminis-

---

[6] See *DeKalb County Sch. Dist. v. Schrenko*, 109 F3d at 692.

[7] See id. at 687 (quoting district court's December 19, 1994, order that the State's " 'transportation policy is *not* a vestige of the dual school system' ") (emphasis in original); id. at 692-693 (noting DeKalb achieved unitary status in its transportation program in 1988); see *Mills v. Freeman*, 942 F. Supp. 1449 (N.D. Ga. 1996) (dismissing DeKalb school desegregation case after concluding that school system had achieved unitary status in all areas).

tration. Any student who resides within such mileage limitation shall not be eligible to be counted for school transportation state-aid purposes, with the exception of disabled students being transported. (Emphasis supplied.)

The primary issue in this case is the proper interpretation of "school to which they are assigned" in subsection (d). The State interprets the phrase to mean the school within the student's attendance zone, which is the geographic area that the local school system draws around each school. Based on this interpretation, the State has adopted a policy that reimburses local school systems for the transportation of students to and from the zone schools. DeKalb contends that the phrase means the school that the child actually attends. Under its interpretation, the State would be required to reimburse the district for the additional expense incurred in transporting students in the M-to-M and magnet school programs, who often live long distances from the schools they attend.

## State Funding of Pupil Transportation

The student transportation statute now codified at OCGA § 20-2-188 was originally enacted as part of the Minimum Foundation Program of Education Act of 1964.[8] After its enactment, the State Board of Education adopted a new formula for allocating state funds for student transportation. The State does not pay for the actual costs that local school systems incur in providing student transportation, but instead reimburses local systems for part of their transportation costs.

The grant formula in use since 1965 is based on a survey of local transportation needs. The local system periodically submits large survey maps that show the location of the system's schools, the attendance zone for each school, and the residence of the students who live more than one-and-a-half miles from their zone school. The State then designs a plan with hypothetical bus routes to achieve the most cost-efficient bus route system for the system. The State measures the route mileage in its plan to determine the number of buses needed to transport the children to their zone school. The State then calculates each local school system's allotment of state transportation funds based on the number of buses and route miles in these ideal routes. As the Eleventh Circuit found, "[t]hese calculations are made without regard to the actual schools to which any of the students are assigned or to the local district's actual bus routes or trans-

---

[8] See 1964 Ga. Laws 3, 16-19.

portation expenses."[9]

The State's grant formula affects DeKalb's funding in two ways. First, the calculation does not count children who live within one-and-a-half miles of their zone school, but who attend a school more than one-and-a-half miles away under the M-to-M or magnet programs. Second, the state formula since 1986 undercounts the route mileage for children who live more than one-and-a-half miles from their zone school and attend a M-to-M or magnet school by treating those students as if they attended their nearby zone school.

## Interpreting the Student Transportation Statute

1. In construing statutes, courts must consider the General Assembly's intent in enacting the statute, "keeping in view at all times the old law, the evil, and the remedy."[10] All statutes relating to the same subject matter are construed together to ascertain the legislative intent.[11] Ordinary signification shall be applied to all words, except words of art and words connected with a particular subject matter.[12]

We consider the specific language of OCGA § 20-2-188 in light of these general rules of construction. The challenged language in subsection (d) provides that students who live a certain distance from the "school to which they are assigned . . . shall be . . . counted as transported students." Neither this subsection nor the student transportation statute as a whole provides any definition of the term "assigned school." Other provisions in the Quality Basic Education Act are not helpful because they use different criteria for determining how to count students for purposes of funding other programs.[13] Without specific legislative guidance, we cannot rely solely on the statutory language in subsection (d) to decide whether the school to which students are assigned means the school in the student's attendance zone, as the State contends, or the school that the student actually attends, as DeKalb contends.

Given this ambiguity, we consider other relevant provisions in OCGA § 20-2-188. Subsection (a) gives the State Board broad discretion to calculate costs for purposes of allocating state aid for student

---

[9] *DeKalb County Sch. Dist. v. Schrenko*, 109 F3d at 685.
[10] See OCGA § 1-3-1.
[11] See *Miller v. Georgia Ports Authority*, 266 Ga. 586, 587 (470 SE2d 426) (1996).
[12] See OCGA § 1-3-1.
[13] See, e.g., OCGA § 20-2-160 (describing the formula for obtaining the full-time equivalent program count for each local school system); OCGA § 20-2-161 (describing the Quality Basic Education Formula for calculating total funds needed by each local school system); see also *McDaniel v. Thomas*, 248 Ga. 632, 635 (285 SE2d 156) (1981) (unlike most state allotments to local school systems, transportation program considers factors other than the number of pupils in average daily attendance).

transportation. In developing a method of calculation, the State Board is directed to consider both standard transportation costs that every local system incurs in operating an economical and efficient transportation program and variable costs that depend on local circumstances. The statute enumerates 15 factors that the State Board may consider in establishing these costs and ends the list with a catch-all provision – "such other factors and circumstances as the state board may find relevant for the purpose of establishing such schedules and cost factors." Thus, the specific phrase under challenge in this case must be construed within the context of this grant of wide authority to the State Board in subsection (a).

2. Where statutory provisions are ambiguous, courts should give great weight to the interpretation adopted by the administrative agency charged with enforcing the statute.[14] Although this Court is "not bound to blindly follow" an agency's interpretation, we defer to an agency's interpretation when it reflects the meaning of the statute and comports with legislative intent.[15]

The General Assembly's stated purpose in enacting the Minimum Foundation Program of Education Act in 1964 was to establish equal educational opportunities for Georgia's children and youth "regardless of where they may live or what their station in life may be."[16] As the federal district court in Savannah explained, while the State maintained a dual system of schools, "there also existed in the late 1950s and early 1960s a strong movement by lawmakers to more equally apportion education funds between poorer, often rural districts and wealthier urban districts, as well as to increase economy and efficiency in public education, including pupil transportation."[17] The result was a new statewide funding statute that established minimum standards for public education, sought more efficiency in operating schools, and implemented a new funding formula based on a local school system's financial base.[18]

---

[14] See *State of Georgia v. Camp*, 189 Ga. 209 (6 SE2d 299) (1939); *Georgia Real Estate Comm'n v. Peavy*, 229 Ga. App. 201 (493 SE2d 602) (1997).

[15] See *Sawnee Elec. Membership Corp. v. Georgia Pub. Serv. Comm'n*, 273 Ga. 702 (544 SE2d 158) (2001); *Carter v. Oxford*, 102 Ga. App. 762, 767 (118 SE2d 216) (1960), aff'd, 216 Ga. 821 (120 SE2d 298) (1961).

[16] 1964 Ga. Laws at 6; see *Board of Pub. Educ. v. Zimmerman*, 231 Ga. 562, 569 (203 SE2d 178) (1974) (Jordan, J., concurring specially) (primary purpose of minimum foundation program is to provide a uniform system of common schools throughout the state). See generally *McDaniel v. Thomas*, 248 Ga. at 633-638 & appendix (discussing public school financing in Georgia).

[17] See *Board of Pub. Educ. v. State of Georgia*, No. CV 490-101, slip op. at 6.

[18] See 1964 Ga. Laws at 3-4, 6-7; see also *Ingram v. Payton*, 222 Ga. 503 (150 SE2d 825) (1966) (upholding 1964 Act's differential treatment of independent school systems and county school systems in determining the financial ability of local units); *Rice v. Cook*, 222 Ga. 499 (150 SE2d 822) (1966) (rejecting challenge to State's calculation of Atlanta school system's financial ability to pay).

The legislative history of the student transportation provisions in the 1964 Act reflects this desire for uniformity, efficiency, and equity. During the 1950's, the State allocated state funds for student transportation based on a statutory formula that required the State Board to consider the number of pupils transported and their density per square mile.[19] In 1961, the General Assembly added a provision defining for the first time the students who were eligible to be counted for state-aid purposes.[20]

In 1964, the General Assembly completely revised the provisions on state aid to local school systems for pupil transportation. Unlike the previous laws, the 1964 legislation did not specify a statutory formula for calculating funds to defray student transportation expenses, but instead gave the State Board authority to develop its own funding formula.[21] The 1964 law also redefined the pupils who were eligible to be counted as transported students. Among other changes, it substituted "school to which they are assigned" for "school which such pupil is eligible to attend" and made an express reference to subparagraph (a). It is not clear from these latter changes in subsection (d) whether the legislature intended to alter the eligibility criteria or clarify them.

Based on this statutory authority, the State Board approved a new method for calculating costs and allocating state aid for student transportation. The State began using transportation surveys in 1965 and has continued their use to the present. The starting point under this approach is the local school system's survey map identifying the students eligible to be counted as "transported students." The State Board adopted a policy in 1964 that no service would be provided "for State allotment purposes for pupils transported from one residential attendance area to another residential attendance area."[22] The State then directed local education officials to draw attendance areas for each individual school and plot all the children that they transport beyond one-and-one-half miles of the school. For purposes of allocating state aid, the State chose to define a student's assigned school as the school in the student's residential attendance zone, as designated by the local school system on the transportation survey map.

---

[19] See 1949 Ga. Laws 1406, 1412 ("amount of funds needed . . . shall be determined by multiplying the number of transported pupils in average daily attendance . . . by the median cost of transportation per pupil in [White and Negro] density groups"); see also 1952 Ga. Laws 400, 401 (directing State Board to consider a schedule of minimum salaries for drivers in its formula); 1957 Ga. Laws 380, 381 (formula must consider drivers' salaries, number of transported students, and students' density per square mile).

[20] See 1961 Ga. Laws 104.

[21] See 1964 Ga. Laws at 16-17.

[22] See *Board of Pub. Educ. v. State of Georgia*, CV 490-101, slip op. at 8.

Because this definition comports with the legislative intent behind the school funding and student transportation laws, we hold that the State Board has adopted a reasonable interpretation of the phrase "the school to which they are assigned" as the school in the student's attendance zone. In support, we note that the State's definition employs an objective standard for defining a student's assigned school that can be applied uniformly to all students in every local school system throughout the State. If "assigned" were defined as "attended," as DeKalb contends, state aid for pupil transportation would depend on each individual's choice of schools, as well as each local school system's financial ability to offer magnet schools and other special programs. Given the emphasis in the state funding statutes on uniformity, economy, and equity in public education, it seems highly unlikely that the General Assembly intended for state officials to disregard the traditional pattern of school attendance and instead consider each child's actual attendance at the school of their choice, no matter where it was located.

Moreover, since the State Board adopted its grant formula based on transportation surveys nearly 40 years ago, the legislature has chosen not to amend the relevant statutory provisions on student transportation. The General Assembly has twice enacted new comprehensive state funding laws, the Adequate Program for Education in Georgia Act of 1975 and the Quality Basic Education Act of 1985, without changing the basic provisions for calculating and allotting state aid for pupil transportation.[23] In addition, the General Assembly has never appropriated additional state funds to pay for the costs of transporting students to M-to-M, magnet, and other schools outside the students' residential attendance zone.

Finally, our decision is consistent with the general deference that courts give to public officers in determining how to appropriate public funds for education. In early cases involving local funding of student transportation, this Court upheld the right of a county board of education to use school buses to transport children from one school district in the county to another and to refuse to transport students from one district to another.[24] Despite these contrary results, our rationale was the same and applies equally to the state officials in this case. Because our State Constitution and state statutes vest edu-

---

[23] See 1985 Ga. Laws 1657, 1701-1705, now codified at OCGA § 20-2-188; 1974 Ga. Laws 1045, 1061-1064.

[24] See, e.g., *Pass v. Pickens*, 204 Ga. 629 (51 SE2d 405) (1949) (county board of education did not abuse its discretion in declining to provide transportation for grammar school students who wished to attend school in another district in county); *Keever v. Board of Educ. of Gwinnett County*, 188 Ga. 299 (3 SE2d 886) (1939) (county board of education and local-tax school district did not abuse their discretion in paying to transport pupils from their home school district to a school in another district).

cation officials with broad discretion to operate the public schools in the best interest of the school children, courts should not interfere with the actions of these public officials in the area of student transportation unless they have violated the law or grossly abused their discretion.[25]

DeKalb contends that we should not defer to the agency's interpretation because the State Board has not consistently interpreted OCGA § 20-2-188. Although the State Board has adopted several different written policies over the past four decades, the record shows that the State has adhered, with limited exceptions, to its stated practice of calculating costs based on transporting students to and from their zone school.[26] Furthermore, DeKalb cites no evidence that the State has deviated from its attendance zone policy in calculating costs since 1986, when the State began counting magnet and M-to-M students as transported students.

Therefore, we reject DeKalb's argument that the State Board has improperly interpreted a student's assigned school for purposes of state aid for pupil transportation.

### Payment of Past Transportation Costs

3. Mandamus is an extraordinary remedy to compel a public officer to perform a required duty when there is no other adequate legal remedy. It is a discretionary remedy that courts may grant only when the petitioner has a clear legal right to the relief sought or the public official has committed a gross abuse of discretion.[27] In general, mandamus relief is not available to compel officials to follow a general course of conduct,[28] perform a discretionary act,[29] or undo a past act.[30]

---

[25] See *Smith v. Maynard*, 214 Ga. 764 (107 SE2d 815) (1959) (1964 Minimum Foundation Program Act vests broad discretionary powers in State Board); *Douglas v. Board of Educ. of Johnson County*, 164 Ga. 271 (138 SE 226) (1927) (county board of education had discretion to pay for transportation of students to consolidated school based on its needs and financial ability).

[26] See *Board of Pub. Educ. v. State of Georgia*, CV 490-101, slip op. at 8 (although State typically restricted its surveys and bus routes to attendance zones, there were some exceptions during the 1960's for "freedom of choice plans" and when space was unavailable at the zone school).

[27] See *Henderson v. McVay*, 269 Ga. 7 (494 SE2d 653) (1998); *Dougherty County v. Webb*, 256 Ga. 474 (350 SE2d 457) (1986); OCGA § 9-6-21.

[28] See *Lowe v. State of Georgia*, 267 Ga. 754 (482 SE2d 344) (1997) (mandamus relief not available to compel State to fund and implement Tuition Grant Act, which provides for direct grants of money to parents of children attending nonsectarian private schools).

[29] See *Persons v. Mashburn*, 211 Ga. 477 (86 SE2d 319) (1955) (mandamus not available to require state banking official to issue a certificate approving a banking corporation's application for a charter).

[30] *Atlanta Indep. School System v. Lane*, 266 Ga. 657, 660 (469 SE2d 22) (1996) (mandamus relief not available to compel school system to repay tax funds received under an agree-

Under the statutory interpretation that we have adopted, DeKalb is not entitled to mandamus relief. State education officials adopted a valid interpretation of OCGA § 20-2-188 and reasonably exercised their discretion in allocating state aid to local school systems for pupil transportation. As a result, DeKalb has not established a clear legal right to the funds sought or a gross abuse of discretion by state officials.

4. Contrary to the dissent's position, DeKalb would not be entitled to the payment of state funds for past transportation costs even under its interpretation of the statute. Even when this Court has held that local education officials were violating the law, we have rejected a claim that the school system must repay tax funds already received. In a case involving an invalid revenue sharing agreement, we refused to compel the Atlanta Independent School System to reimburse the City of Atlanta for past tax payments that it had made for the "public benefit of educating the City's children."[31] Although in that case the City was seeking the repayment of local tax funds and this case involves the school system seeking the payment of additional State funds, both cases concern whether courts should grant retrospective monetary relief in mandamus actions. Just as we held that the discretionary remedy of mandamus was not available to compel a local school system to repay tax funds, mandamus is not available here to compel the State to reimburse DeKalb for its past transportation expenses.

In addition, DeKalb is not entitled to monetary relief because mandamus generally is not available to compel officials to perform discretionary acts. To reimburse DeKalb under its cost calculations, the State Board would be required to change the State's policy concerning students who must be counted as transported students, apply the new policy retroactively to 1978, recalculate the grants awarded to DeKalb every year for the past 25 years, and allocate additional funds to DeKalb to cover the increased amounts under the revised grant formula. This litany illustrates the discretionary nature of the actions that the State takes, and has taken, in awarding state funds to local districts for student transportation. Thus, regardless of the interpretation adopted, we should decline to exercise our discretion and interfere with the State Board's discretion in establishing education policy and funding priorities.[32]

In conclusion, DeKalb has not established that the State Board

---

[31] See id.

[32] See *Ingram v. Payton*, 222 Ga. at 511 (Decatur city school system should make its request to legislature if it wants State Board to allocate more state money to independent school systems).

ment with the city).

has improperly interpreted a student's assigned school, for purposes of state aid for pupil transportation, as the school that the local school system assigns or designates to be the student's zone school on the transportation survey map. Because state education officials have adopted a valid statutory interpretation and have not grossly abused their discretion in calculating pupil transportation costs, DeKalb is not entitled to mandamus relief. Therefore, we reverse the trial court's order compelling the State to pay DeKalb $105 million for costs incurred in transporting students since 1978 and to pay future costs based on the schools that students attend.

*Judgment reversed. All the Justices concur, except Carley and Thompson, JJ., who dissent.*

CARLEY, Justice, dissenting.

I dissent to the majority's adoption of the interpretation of OCGA § 20-2-188 (d) advanced by the Superintendent of Education (Superintendent). In my opinion, the trial court correctly upheld the construction of the statute urged by the DeKalb County School District (School District) and, based on that construction, properly awarded the transportation costs attributable to prior years.

Subsection (d) of OCGA § 20-2-188 provides, in relevant part, that

[s]tudents who live beyond one and one-half miles from *the school to which they are assigned,* according to the nearest practical route by school bus, shall be eligible to be counted as transported students for the purpose of calculating that portion of the expense of student transportation associated with transporting students from home to school and from school to home as authorized under subsection (a) of this Code section, provided such students are actually transported to such school by school bus or other vehicle made available for this purpose by the local unit of administration. (Emphasis supplied.)

The question presented for resolution is the meaning of the emphasized language. According to the Superintendent, "the school to which they are assigned" means that school which is designated to serve the neighborhood in which the students live. The School District, on the other hand, maintains that the statute refers to the school at which the students actually are enrolled. The distinction is significant. Under the Superintendent's interpretation, all students are deemed to attend their neighborhood schools for purposes of determining eligibility for calculation of transportation costs. Pursuant to the School District's construction, each individual student's eli-

gibility is based upon his or her proximity to the school of actual attendance.

In matters of statutory construction, the intent of the General Assembly is controlling, and the courts must " 'look first to the words of the statute to determine what that intent was and if those words be plain and unambiguous and the intent may be clearly gathered therefrom, we need look no further in determining what that intent was.' [Cit.]" *Early v. Early*, 269 Ga. 415, 416 (499 SE2d 329) (1998). "In all interpretations of statutes, the ordinary signification shall be applied to all words. . . ." OCGA § 1-3-1 (b). OCGA § 20-2-188 (d) specifies a calculation of transportation costs based upon travel to and from home and the schools to which the students are "assigned." "Assign" means "[t]o appoint, allot, or designate for a particular purpose, or duty. To point at, or point out; to set forth, or specify; to mark out or designate; to particularize . . . ." Black's Law Dictionary (5th ed. 1979). Thus, the word connotes a sense of definiteness and affiliation. In my opinion, students are not "assigned" to a particular school simply because it may have been designated to serve the neighborhood. The mere designation of an attendance zone for a school in a particular locality is not the equivalent of assigning all students in that area to that school. For any number of reasons, a student can be sent to a school other than that serving his or her immediate neighborhood. Because the language of the provision focuses on travel to and from the schools to which the students are themselves "assigned," rather than on their proximity to a designated local facility, I believe that it clearly and unambiguously expresses the legislative intent that eligibility is to be based upon the transportation of students between home and the school in which they are actually enrolled.

Since the enactment is unambiguous, the Superintendent's contrary interpretation of the statute is not persuasive. "As long as the language is clear and does not lead to an unreasonable or absurd result, 'it is the sole evidence of the ultimate legislative intent.' [Cit.]" *Ray v. Barber*, 273 Ga. 856 (1) (548 SE2d 283) (2001). The courts are required "to give unambiguous statutes the interpretation which their language clearly implies, irrespective of contrary administrative interpretations . . . ." *Thompson v. Eastern Air Lines*, 200 Ga. 216, 225 (39 SE2d 225) (1946). The General Assembly's failure to nullify the Superintendent's construction of the enactment is immaterial. Only the judiciary has the constitutional authority to interpret statutes, and we do not delegate that responsibility to either the legislative or executive branch. *Etkind v. Suarez*, 271 Ga. 352, 353 (1) (519 SE2d 210) (1999); *Elder v. Home Building & Loan Assn.*, 188 Ga. 113, 115 (2) (3 SE2d 75) (1939). Thus,

"[l]ong-continued practice and the approval of administrative authorities may be persuasive in the interpretation of doubtful provisions of a statute, but can not alter provisions that are clear and explicit when related to the facts disclosed."

*Standard Oil Co. of Ky. v. State Revenue Commission*, 179 Ga. 371, 376 (176 SE 1) (1934). Compare *Abernathy v. City of Albany*, 269 Ga. 88, 89 (495 SE2d 13) (1998) (holding that *a court's interpretation* becomes an "integral part of the statute" which the General Assembly may then accept or amend).

Eligibility based upon the school of actual attendance, rather than that located in the student's neighborhood, is an objective standard which applies uniformly in all school districts in this state, rural or urban and wealthy or poor alike. Moreover, basing eligibility on the proximity to neighborhood schools which students do *not* attend would result in a distorted reflection of the actual cost of transporting them. OCGA § 20-2-188 (a) provides that "the amount of funds to be actually distributed to any local unit of administration under this Code section during any school year shall not exceed the *actual costs* incurred by the local unit in transporting students to and from public schools. . . ." If the provision contemplates that a local school district may receive funds up to its "actual costs" of transporting students, then basing the determination of student eligibility on a criterion which is completely unconnected with those costs would be inconsistent with the statutory mandate. Therefore, the Superintendent's construction not only conflicts with the unambiguous language of the statute, it also violates the principle that "[t]he courts will not ascribe to the General Assembly an intention to adopt a statute containing inconsistent or contradictory provisions. [Cit.]" *Vollrath v. Collins*, 272 Ga. 601, 604 (2) (533 SE2d 57) (2000). Accordingly, I believe that the trial court correctly rejected that interpretation.

With regard to the award of transportation costs for previous years, mandamus relief may be sought only "to compel a due performance, if there is no other specific legal remedy for the legal rights." OCGA § 9-6-20. It "applies prospectively only. It will not lie to compel the undoing of acts already done and this is so even though the action taken was clearly illegal. [Cit.]" *Atlanta Independent School System v. Lane*, 266 Ga. 657, 660 (6) (469 SE2d 22) (1996). Here, the trial court did not exceed the permissible scope of mandamus by awarding damages or by ordering the Superintendent to reverse any previous administrative act or decision. It only compelled the payment of such accumulated *additional* sums as the School District was entitled to receive under the provisions of OCGA § 20-2-188 (d). See *Griffies v.*

*Coweta County*, 272 Ga. 506 (530 SE2d 718) (2000). Compare *Atlanta Independent School System v. Lane*, supra at 660 (6) (trial court erroneously ordered the *repayment* of *previously* disbursed tax funds). Because the Superintendent had no discretion in the performance of the duty to pay that greater amount of transportation costs under the unambiguous provisions of the statute, the trial court was authorized to issue a writ of mandamus to compel payment to the School District. *Lomax v. McBrayer*, 248 Ga. 753, 755-756 (1), (2) (286 SE2d 35) (1982).

The majority does not attempt to distinguish or overrule *Lomax v. McBrayer*, supra, which is controlling precedent for holding that mandamus is an available remedy for compelling the Superintendent to pay the additional sums. Thus, the trial court's order was proper in all respects and should be affirmed in its entirety.

In addition to the claim under OCGA § 20-2-188 (d), the School District asserted an alternative theory of recovery based upon administrative regulations adopted in 1996. The trial court held that the School District was also entitled to recover transportation costs pursuant to those regulations, but it concluded that that alternative claim was rendered moot by its holding that the costs were recoverable under the statute. Reversal of the trial court's ruling on the statutory claim now removes any question of mootness as to the School District's regulatory claim. However, the majority does not expressly address the viability of the alternative theory of recovery. Presumably, the majority perceives that its holding that retrospective monetary relief is not available in a mandamus action would also bar a recovery for past transportation costs under the regulations. As previously noted, however, I strongly believe that mandamus is available when, as here, the petitioner seeks to recover such additional accumulated sums to which it is entitled. *Lomax v. McBrayer*, supra. Moreover, even if the School District cannot recover for past transportation costs, it certainly would not be precluded from seeking prospective mandamus relief. Compare *Atlanta Independent School System v. Lane*, supra at 660 (6). I do not believe that the trial court erred in its conclusion that the regulations are a viable alternative basis for awarding transportation costs. Therefore, even accepting as correct the majority's statutory analysis, the appropriate resolution of this case would be to reverse as to the statutory claim and remand with direction that the trial court award the School District prospective relief on the regulatory claim.

I am authorized to state that Justice Thompson joins in this dissent.

DECIDED JUNE 9, 2003 —
RECONSIDERATION DENIED JULY 11, 2003.

*Thurbert E. Baker, Attorney General, Alfred L. Evans, Jr., Senior Assistant Attorney General*, for appellants.
*Sutherland, Asbill & Brennan, Alfred A. Lindseth, Rocco E. Testani, Melanie W. Crowe, Weekes & Candler, Gary H. Sams*, for appellees.